UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| SYNOVIA DANIELS,                                   : | Case No. 3:16-cv-00199 |
| PERSONAL RESPRESENTATIVE                    : | |
| OF THE ESTATE OF HAROLD SNIPE,     : | **COMPLAINT FOR** |
| | **DAMAGES** |
| Plaintiff,                                             : | |
| : | **DEMAND FOR** |
| VS.                                                             : | **JURY TRIAL** |
| : | |
| GENERAL ELECTRIC COMPANY                      : | |
| BAYER CROPSCIENCE, INC., individually and as : | |
| successor-in-interest to Aventis Cropscience USA, : | |
| Inc. f/k/a Rhone-Poulenc AG Co. f/k/a AMCHEM : | |
| Products, Inc. f/k/a Benjamin Foster Co.;   : | |
| CBS CORPORATION f/k/a VIACOM INC.,        : | |
| successor-by-merger with CBS CORPORATION : | |
| f/k/a WESTINGHOUSE ELECTRIC                 : | |
| CORPORATION;                                     : | |
| CRANE CO. individually and / or as parent, alter ego : | |
| and / or successor-in-interest to CHAPMAN  : | |
| VALVE COMPANY, COCHRANE CORP.,    : | |
| CHEMPUMP,CRANE SUPPLY, CRANE PUMPS : | |
| AND SYSTEMS, INC., and / or JENKINS      : | |
| VALVES;                                              : | |
| FOSTER WHEELER, LLC;                          : | |
| GOULDS PUMPS, INCORPORATED;          : | |
| IMO INDUSTRIES, INC.                           : | |
| INDUSTRIAL HOLDINGS CORPORATION  : | |
| f/k/a THE CARBORUNDUM                     : | |
| COMPANY;                                      : | |
| INGERSOLL-RAND COMPANY;                  : | |
| MET PRO CORPORATION, individually and as parent of : | |
| Dean Pump Division;                            : | |
| METROPOLITAN LIFE INSURANCE COMPANY; : | |
| NIANTIC SEAL RIP, INC.;                       : | |
| SAFEGUARD SCIENTIFICS INC. successor-in-interest : | |
| to PENN EL SERVICE CO., INC.;           : | |
| UNION CARBIDE CORPORATION;           : | |
| VIKING PUMPS, INC.;                           : | |
| WARREN PUMPS, LLC;                         : | |
| WEIR VALVES & CONTROLS USA INC.  f/k/a : | |
| Atwood & Morrill Co.; and                  : | |
| WM. POWELL COMPANY, The;              : | |
| Defendants                     : | February 5, 2016 |

1

## Jurisdiction

1. The District Court has jurisdiction over the Defendant pursuant to 28 U.S.C. § 1332 in that the matter in controversy is between citizens of different states and the amount in controversy exceeds the sum of $75,000.00, exclusive of interest and costs.

2. The Plaintiff's decedent was a resident of the State of South Carolina.

3. The Defendants are incorporated and have their principal places of business in states other than South Carolina. See *infra*.

## Venue

4. Venue is proper in Connecticut because it is where the substantial part of the events and omissions giving rise to the claim occurred.

## Parties

5. The Plaintiff, Synovia Daniels, was appointed personal representative for the Estate of Harold Snipe in the State of South Carolina Court of Probate, County of Charleston, on or about May 13, 2014.

6. The Defendants are as follows.  Each of these Defendants is a foreign corporation which has done business in the State of Connecticut.

    a. General Electric Company is a New York corporation which does business in the State of Connecticut with a principal place of business at 3135 Easton Turnpike, Fairfield, Connecticut 06828.  Its agent for service is CT Corporation System, One Corporate Center, Floor 11, Hartford, CT  06103.

    b. Bayer CropScience, Inc. individually and as successor to Aventis Cropscience USA, Inc. f/k/a Rhone-Poulenc AG Co. f/k/a AMCHEM Products, Inc. f/k/a Benjamin Foster Company is a New York corporation which has done business in the State of Connecticut with its principal place of business at 2 TW Alexander Drive, Research Triangle Park, NC  27709.  Its agent for service is Corporation Service Company, 50 Weston Street, Hartford, CT  06120-1537.

2

c. <u>CBS Corporation, a Delaware corporation f/k/a Viacom Inc., successor-by-merger with CBS Corporation, a Pennsylvania corporation, f/k/a Westinghouse Electric Corporation,</u> is a Delaware corporation, does business in the State of Connecticut, and has a principal place of business at 51 West 52nd Street, New York, New York 10019.  Its agent for service is Corporation Service Company, 50 Weston Street, Hartford, CT  06120.

d. <u>Crane Co. individually and / or as parent, alter ego or successor-in-interest to Chapman Valve Co., Cochrane Corp., Chempump, Crane Supply, Crane Pumps and Systems, Inc. and / or Jenkins Valves</u> is a Delaware corporation which does business in the State of Connecticut with its principal place of business at 100 First Stamford Place, Stamford, Connecticut.

e. <u>Foster Wheeler, LLC</u> is a Delaware corporation which has done business in the State of Connecticut with a principal place of business at Perryville Corporate Park, Clintonville, NJ 08809 and an agent for service at The Corporation Trust Company, 1209 Orange Street, Wilmington, DE 19801, Att'n: Scott LaScala.

f. <u>Goulds Pumps, Incorporated</u> is a Delaware corporation which has done business in the State of Connecticut with its principal place of business at 240 Fall Street, Seneca Falls, New York.

g. <u>IMO Industries, Inc.</u> is a Delaware corporation which has done business in the State of Connecticut with its principal place of business at 1710 Airport Road, Monroe, North Carolina.  Its agent for service is CT Corporation System, One Corporate Center, Floor 11, Hartford, CT  06103.

h. <u>Industrial Holdings Corporation</u> f/k/a <u>The Carborundum Company</u>, is a New Jersey corporation which has done business in the State of Connecticut with a principal place of business at 1 New Bond Street, Worcester, MA 01615-0008 and an agent for service at The Prentice-Hall Corporation System, 80 State Street, Albany, NY  12207.

i. <u>Ingersoll-Rand Company</u> is a New Jersey corporation which has done business in the State of Connecticut with its principal place of business at One Centennial Avenue, Piscataway, NJ  08855.  Its agent for service is CT Corporation System, One Corporate Center, Floor 11, Hartford, CT  06103.

j. <u>Met Pro Corporation</u>, individually and as parent, alter ego and / or successor-in-interest to Dean Pumps, is a Delaware corporation which has done business in the State of Connecticut with its principal place of business at 160 Cassell Road, Harleysville, PA 19438.

k. <u>Niantic Seal RIP Inc.</u> is a Rhode Island corporation which has done business in the State of Connecticut. Its principal address is 182 Torrey Road, South Kingstown, Rhode Island. Its agent for service is Edmund M. Mauro, III, 182 Torrey Road, South Kingstown, RI 02879.

l. <u>Safeguard Scientifics Inc.</u> successor-in-interest to <u>Penn El Service Co., Inc.</u> is a Pennsylvania corporation which has done business in the State of Connecticut with its principal place of business at 435 Devon Park Drive, Building 800, Wayne, PA  19087.

m. <u>Union Carbide Corporation</u> is a New York corporation which has done business in the State of Connecticut with its principal place of business at 1254 Enclave Parkway, Houston, TX  77077.  Its agent for service is CT Corporation System, One Corporate Center, Floor 11, Hartford, CT  06103-3220.

n. <u>Viking Pump, Inc., a Unit of IDEX Corporation</u>, is a Delaware corporation which has done business in the State of Connecticut with a principal place of business at 1925 W. Field Court, Suite 200, Lake Forest, IL 60045.

o. <u>Warren Pumps LLC</u> is a Delaware corporation which has done business in the State of Connecticut with its principal place of business at 82 Bridges Ave., Warren, MA  01083-0969 and its agent for service is C T Corporation System, 155 Federal Street, Suite 700, Boston, MA 02110.

p. <u>Weir Valves & Controls USA Inc</u>. f/k/a <u>Atwood & Morrill Co</u>. is a Massachusetts corporation which does business in the State of Connecticut with its principal place of business at 29 Old Right Road, Ipswich, MA 01938 and an agent for service at C T Corporation System, 155 Federal Street, Suite 700, Boston, MA 02110.

q. <u>The WM. Powell Company</u> is an Ohio corporation which has done business in the State of Connecticut with an agent for service at 2503 Spring Grove Avenue, Cincinnati, OH 42514.

7. The Defendants who are successor corporations have assumed the assets and liabilities of their predecessors, and they are responsible for the liabilities of the predecessors, both as to compensatory and as to punitive damages.  As used in this Complaint, "Defendant(s)" includes, unless expressly stated to the contrary above, all predecessors for whose actions plaintiff claims the named Defendant(s) is(are) liable.

**Statement of Facts**

8. Beginning in 1966 and for some years thereafter, the Plaintiff's decedent, Harold Snipe, worked as a welder inside submarines under construction and repair at Electric Boat Corporation's Groton, Connecticut shipyard.

4

9. His concomitant duties, work and activities caused him to work in areas where he and others were handling and working with asbestos products or products containing, involving or requiring the use of asbestos.

10. Consequently, he was exposed to asbestos fibers and asbestos-containing materials sold by the defendants.

11. At various times during his employment, he was around and with the Defendants' products, which were designed to require or incorporate asbestos for use, operation or function.

12. The Defendants were either in the business of selling products which contained, required, or incorporated asbestos for use, operation or function; or they acted jointly with other such companies to withhold or prevent information from reaching the consumers and public.

13. During the decedent's employment and in his duties, work and activities, he was exposed to the asbestos, asbestos products or products containing, involving or requiring the use of asbestos manufactured by the Defendants and otherwise placed into the stream of commerce by the Defendants.  As part of his employment and in his work, duties and activities, he was forced to come in contact with asbestos fibers and dust coming from said asbestos products.

14. At all relevant times, the asbestos, asbestos related insulation products, asbestos-containing products, and the asbestos which was installed or used for the operation or function of the Defendants' products, were used and employed for the purpose for which they were manufactured, sold and intended to be used, in a manner foreseeable to the Defendants.

15. All or some of the Defendants became aware of the dangers of breathing asbestos that decedent was exposed to Defendants' asbestos, asbestos related insulation products, asbestos-containing products, and products that required or involved asbestos for use, operation or function but they intentionally and fraudulently concealed the danger from the decedent and the public or

conspired to do the same and intentionally misrepresented the information they caused to be published concerning the dangers of asbestos.

16. The Defendants were aware or should have been aware of medical and scientific data, studies and reports since approximately 1929, which information clearly indicated that asbestos and asbestos containing products were hazardous to the health and safety of the decedent and other human beings.

17. The Defendants have at all relevant times consistently failed to acknowledge, publish, or in any way advise of the studies and reports known throughout the industry since the 1920's, including studies conducted by or on behalf of various Defendants in the asbestos industry.

18. It was the continuing duty of the Defendants to advise and warn purchasers, consumers, users and those exposed to the products, and prior purchasers, consumers and users of all dangers, characteristics and defects discovered subsequently to their initial marketing or sale of their asbestos, asbestos related insulation products, asbestos-containing products, and products that required or involved asbestos for use, operation or function, which duty the Defendants breached.

19. As a result of the acts of the Defendants as aforesaid and the decedent's exposure to asbestos, the decedent was diagnosed as suffering from lung cancer, asbestosis, pleural effusions, pleural plaques, asbestos-related lung disease, lung disease and / or loss of lung function. He endured significant pain and mental anguish.  His earning capacity was impaired and he was severely restricted in his usual activities. He was required to spend large sums of money for medical care and treatment. He suffered grief, fear and anguish over the effect of his illness; the pain caused by his symptoms; the worsening of his symptoms, condition, and disease; his premature death; and the effect his illness had, and his premature death would have, on his family.  As a

consequence of his asbestos-related injuries, Harold Snipe died on or about March 19, 2014, and he and his estate were denied life's enjoyment, earnings, and incurred expenses for medical care and treatment and funeral bills, for which just compensation is sought.

## **Claim I**

20. Plaintiff realleges paragraphs 1 through 19.

21. The Defendants' actions were wrongful under Connecticut Products Liability law, Conn. Gen. Stat. § 52-572m, et seq., in one or more of the following ways:

    a. the Defendants' products were designed so as to represent an inherent risk of harm to the Decedent. At all times said asbestos, asbestos related products, and asbestos required for the use, operation or function of the Defendants' products were so intrinsically dangerous so as to necessarily expose users of the materials to probable injury and were ultra hazardous. The Defendants were aware or should have been aware that asbestos would be applied to their products or recommended or required that asbestos would be used on their products;

    b. the Defendants, as part of their business, manufactured, sold and delivered products that contained, required or involved asbestos for use, operation or function into the stream of commerce in a defective, unsafe and inherently dangerous condition as described above, and the asbestos products were expected to and did reach such persons, as the Decedent, without substantial change in the condition in which they were sold;

    c. the Defendants failed to advise the Decedent of the dangerous characteristics of their asbestos, asbestos, asbestos related insulation products, asbestos-containing products, products that contained, required or involved asbestos for use, operation or function, or for their products for which they recommended the use of the asbestos for insulation and other purposes;

    d. the Defendants failed or omitted to provide the Decedent with the knowledge as to what would be reasonably safe and sufficient wearing apparel and protective equipment and appliances to prevent him from being exposed to such deleterious and harmful asbestos related insulation materials, asbestos-containing products, and products that contained, required or involved asbestos for use, operation or function;

    e. the Defendants failed and omitted to place any warnings or sufficient warnings on their asbestos, asbestos related insulation products, asbestos-containing products, and products that contained, required or involved asbestos for use, operation or function to warn the handlers thereof of the dangers to health in coming in contact

7

    with said asbestos, asbestos related insulation products, asbestos-containing products, and products requiring or involving asbestos and failed to warn of the risks and dangers associated with installation and removal of asbestos on their products;

f. the Defendants failed and omitted to take reasonable precautions or to exercise reasonable care to publish, adopt and enforce a safety plan and a safe method of handling and installing said asbestos, asbestos related insulation products, asbestos containing-products, and products which required or involved asbestos for use, operation or function;

g. the Defendants failed to warn or inadequately warned persons such as the Decedent of the dangers to their health from coming in contact with and breathing said asbestos, asbestos related insulation products, asbestos-containing products, and of the dangers involved in installing and removing asbestos from their products;

h. the Defendants failed to warn of the dangers of asbestos to cigarette smokers including the synergistic relationship between cigarette smoking, asbestos exposure and cancer;

i. the Defendants failed to recommend or require methods to improve the work environment;

j. the Defendants failed to properly test and investigate the safety of the asbestos Defendants were manufacturing, selling and distributing or requiring in the use, operation or function of their products or to develop alternative products;

k. the Defendants failed to provide adequate safety instructions for persons who would reasonably and foreseeably come into contact with their products and the asbestos which would be used in the operation or function of their products;

l. the Defendants failed to properly investigate and comply with reasonable standards and regulations relating to the health of those exposed to asbestos products;

m. the Defendants failed to eliminate or reduce the amount of asbestos contained in their products and failed to take steps to reduce the amount of asbestos dust released into the air during the use and operation of their products;

n. the Defendants continued to use or require use of a known cancer-causing product, to wit, asbestos;

o. the Defendants intentionally misrepresented that their asbestos, asbestos related insulation products, asbestos-containing products, or products they knew or should have known required or involved asbestos for use, operation or function

      were reasonably safe for their intended use and fraudulently concealed information about them which fraudulent concealment caused Decedent injuries stated herein;

  p. the Defendants expressly or impliedly warranted that said asbestos, asbestos related insulation products, asbestos-containing products, and products that required or involved asbestos for use, operation or function were of merchantable quality, fit and safe for the purpose for which they were manufactured, sold or used; and

  q. The Defendants breached the said warranties in that their asbestos, asbestos related insulation products, asbestos-containing products, and products that required or involved asbestos for use, operation or function were not fit and safe for the purposes for which they were manufactured, sold and used so that they could not be used without extreme danger to those who breathed the dust coming from their products.

## **Claim II**

22. Plaintiff realleges paragraphs 1 through 21.

23. The Defendants' products were designed so as to represent an inherent risk of harm to the Plaintiff's decedent. At all times said asbestos, asbestos related products, and asbestos required for the use, operation or function of the Defendants' products were so intrinsically dangerous so as to necessarily expose users of the materials to probable injury and were ultra hazardous.

24. The Defendants were aware that asbestos would be applied to or used in or with their products or recommended or required that asbestos would be used on, in, or with their products;

25. The Defendants, as part of their business, manufactured, sold and delivered products that contained, required or involved asbestos for use, operation or function into the stream of commerce in a defective, unsafe and inherently dangerous condition as described above, and the asbestos products were expected to and did reach such persons, as the Plaintiff's decedent, without substantial change in the condition in which they were sold.

26. The Defendants became aware of the dangers of breathing asbestos but they intentionally and fraudulently concealed the danger from the Plaintiff's decedent and the public, or conspired to do

9

the same and intentionally misrepresented the information they caused to be published concerning the dangers of asbestos.

27. The Defendants were aware of medical and scientific data, studies and reports since approximately 1929, which information clearly indicated that asbestos and asbestos containing products were hazardous to the health and safety of the Plaintiff's decedent and other human beings.

28. The Defendants and the other named Defendants continued to use or require use of a known cancer-causing product, to wit, asbestos.

29. Defendants intentionally misrepresented that their asbestos, asbestos related insulation products, asbestos-containing products, or products they knew or should have known required or involved asbestos for use, operation or function were reasonably safe for their intended use and fraudulently concealed information about them which fraudulent concealment caused Plaintiff's decedent's injuries stated herein.

30. The Defendants, after they learned of the dangers of asbestos exposure, intentionally failed or refused to notify the Plaintiff's decedent of the dangers of his exposure and of the need for continuing medical surveillance and conspired to keep such knowledge from the public, and the Plaintiff's decedent.

31. The Defendants, after they learned of some of the dangers of asbestos exposure after others became ill, refused to promptly act to protect the Plaintiff from the known dangers of asbestos.

32. The injuries and damages were caused by the Defendants in that their actions constituted wanton, willful and malicious misconduct and demonstrated a reckless disregard for the consequences the Defendants knew would result.

**Claim III**

33. Plaintiff realleges paragraphs 1 through 32.

34. <u>Metropolitan Life Insurance Co.</u> is a New York corporation which has done business in the State of Connecticut and its agent is the Insurance Commissioner of Connecticut, 153 Market Street, 11th Floor, Hartford, CT  06103.

35. Defendant, Metropolitan Life Insurance Company, individually and as a co-conspirator, aided, abetted, encouraged, counseled, assisted, agreed and conspired with other asbestos manufacturers and distributors to injure the Decedent.

36. The Defendant knew that others' conduct constituted a breach of duty and gave substantial assistance or encouragement to the others so to conduct itself.

37. The Defendant acted in the following fashion:

    a.    Conspirator Metropolitan Life Insurance Company (hereinafter "Met Life") required a tangible <u>quid pro quo</u> from McGill University in the 1920's in exchange for them providing funding for a study of asbestos disease in Canadian miners.  The study revealed asbestos miners suffered from asbestosis.  The study was never published and agents of Met Life materially misrepresented in the published literature this known fact.

    b.    In 1932, Met Life, through its agents Dr. Anthony Lanza, Dr. Fellows, and other, assisted co-conspirator Johns-Manville Corporation with medical examinations of over 1,000 employees of Johns-Manville's factory in Manville, New Jersey.  The report of his study showed that a large percentage of the employees suffered from asbestosis including employees not directly involved in the manufacturing process.  This 1932 medical survey was not published in the medical literature and therefore was unavailable to scientists studying the issues of asbestos disease.  Further collaboration between the conspiring asbestos producers and Met Life officials continued this trend of intentional cover-up.

    c.    Beginning in approximately 1934, conspirator Johns-Manville Corporation, through its agents, Vandiver Brown and Attorney J.C. Hobart, and conspirator Raybestos-Manhattan, hereinafter referred to as "Raybestos", through its agents, Sumner Simpson and J. Rohrbach, suggested to Dr. Lanza, Association Medical Director of Met Life (insurer of conspirators Johns-Manville, Raybestos, and others) that Dr. Lanza publish a study on asbestosis in which Dr. Lanza would affirmatively misrepresent a material fact about asbestos exposure, i.e., the seriousness of the disease process, asbestosis.  This was accomplished through intentional deletion of Dr. Lanza's description of asbestosis as "fatal" and through other selective editing at the behest of the asbestos industry that affirmatively misrepresented asbestos as a disease process less serious than it actually is and was known to be then.  As a result, Dr. Lanza's study was published in the medical literature in this misleading fashion in 1935.  The Defendant

11

Met Life was motivated, in part, to effectuate this fraudulent misrepresentation and fraudulent nondisclosure by the desire to influence proposed legislation to regulate asbestos exposure and to provide a defense in lawsuits and workers' compensation claims involving Johns-Manville, Raybestos, and others, as well as Met Life, the insurer.

    d. In 1936, conspirators American Brake Block Corporation, Asbestos Manufacturing Company, Gatke Corporation, Johns-Manville Corporation, Keasby & Mattison Company (then an alter ego to Defendant Turner & Newall), Raybestos, Union Asbestos and Rubber Company, and United States Gypsum Company, entered into an agreement with the Saranac Laboratories. Under this agreement, these companies acquired the power to decide what information Saranac Laboratories could publish about asbestos disease and control what form such publications were to occur. This agreement gave these conspirators power to affirmatively misrepresent the results of the work at Saranac, and also gave these conspirators power to suppress material facts included in any study. On numerous occasions thereafter, the conspirators exercised their power to prevent Saranac scientists from disclosing material scientific data resulting in numerous misstatements of fact being made at scientific meetings.

    e. On November 11, 1948, representatives of the following conspirators met at the headquarters of Johns-Manville Corporation: American Brake Block Division of American Brake and Shoe Foundry, Gatke Corporation, Keasby & Mattison Company (then an alter-ego to Defendant Turner & Newall), Raybestos-Manhattan, Inc., Thermoid Company, Union Asbestos and Rubber Company, and U.S. Gypsum Company. U.S. Gypsum did not send a representative to the meeting, but instead authorized Vandiver Brown of Johns-Manville to represent its interest at the meeting and to take action on its behalf.

    f. At this November 11, 1948 meeting, these co-conspirators and their respective representatives decided to exert their influence to materially alter and misrepresent material facts about the substance of research started by Dr. Leroy Gardner at the Saranac Laboratories beginning in 1936. Dr. Gardner's research involved the carcinogenicity of asbestos in mice and also included an evaluation of the health effects on humans with critical review of the then-existing standards of dust exposure for asbestos and asbestos-containing products.

    g. At this meeting, the co-conspirators intentionally and affirmatively determined that Dr. Gardner's work should be edited to specifically delete material facts about the cancer-causing propensity of asbestos and the health effects of asbestos on humans and the critique of the dust standards and then published it in the medical literature as edited by Dr. Arthur Vorwald. The acts of these co-conspirators thereby fraudulently misrepresented the risks of asbestos exposure to the public, in general, and the class of persons exposed to asbestos, Decedent.

    h. As a direct result of the influence exerted by the above-described co-conspirators, Dr. Vorwald published Dr. Gardner's edited work in January, 1952, in the <u>Archives of Industrial Hygiene and Occupational Medicine</u> (Vol 3, No. 1), a journal of the American Medical Association. The published version stressed those portions of Gardner's work that the co-conspirators wished stressed, but omitted referenced to cancer, to human asbestosis, and to the inadequacy of the then-established threshold limit values (TLVs). Furthermore, that article made a false claim that the published report was the "complete survey" of Dr. Gardner's work. The Defendant(s) thereby fraudulently, affirmatively, and deliberately disseminated this

12

misleading Dr. Vorwald publication to university libraries, government officials, medical doctors, agencies, the public, and others.

      i.     Such action constituted a material affirmative misrepresentation of the total context of material facts involved in Dr. Gardner's work and resulted in creating an appearance that inhalation of asbestos was less of a health problem than Dr. Gardner's unedited work indicated.

      j.     The following conspirators and others were members of the trade association known as Quebec Asbestos Mining Association (Q.A.M.A): Johns-Manville Corporation, Carey-Canada (individually and as successor to Quebec Asbestos Corporation), National Gypsum Company (n/k/a Asbestos Claims Management Corporation), and Turner & Newall (individually and successor to Bell Asbestos). The members of Q.A.M.A. participated in the above-described misrepresentation of the work of Dr. Gardner published by Dr. Vorwald in the AMA Archives of Industrial Health in 1951. Evidence of the Q.A.M.A.'s involvement in this misrepresentation arises from co-conspirators indicating lose monitoring of the editing process by Q.A.M.A.'s representative Ivan Sabouria, acting on behalf of all Q.A.M.A. members.

      k.     The conspirators who were members of Q.A.M.A., began on or about 1950 to formulate a plan to influence public opinion about the relationship between asbestos and cancer by influencing the medical literature on this subject and then touting and disseminating this literature to the public and the organizations and legislative bodies responsible for regulatory controls of asbestos with the specific intent of misrepresenting the existing scientific information and suppressing contrary scientific data in their possession and control.

      l.     This plan of misrepresentation and influence over the medical literature began on or about 1950 when Q.A.M.A. members selected Saranac Laboratories to do an evaluation of whether cancer was related to asbestos. After a preliminary report authored by Dr. Vorwald in 1952 indicated that a cancer/asbestos relationship might exist in experimental animals, the Q.A.M.A. members refused to further fund the study and it was terminated and never publicly discussed.

      m.     As a result of the termination of this study, these conspirators fraudulently withheld information from the public and affirmatively misrepresented to the public and responsible legislative and regulatory bodies that asbestos did not cause cancer, including affirmative misrepresentations by conspirators' agents Kenneth W. Smith, M.D., Paul Cartier, M.D., Arthur J. Vorwald, M.D., Anthony L. Lanza, M.D., Vandiver Brown, and Ivan Mambourin, said misrepresentations being directed to, inter alia, U.S. government officials, Canadian government officials, U.S. National Cancer Institute, and the general public, including Decedent.

      n.     Subsequently, the Q.A.M.A conspirators contracted with the Industrial Hygiene Foundation (I.H.F.) and Dr. Daniel Braun to further study the relationship between asbestos exposure, asbestosis and lung cancer. In 1957, Drs. Braun and Truan reported to the Q.A.M.A. that asbestosis did increase a worker's chances of incurring lung cancer.

      o.     The Q.A.M.A. conspirators thereafter caused, in 1958, a publication of the work by Braun and Truan in which the findings regarding increased incidence of cancer in persons with asbestosis was edited out by agents of the Q.A.M.A. The published version of this

study contained a conclusion that asbestos exposure did not increase the incidence of lung cancer, a conclusion known by the conspirators to be patently false.

    p. By falsifying and causing publication of studies concluding that asbestos exposure did not cause lung cancer and simultaneously omitting a documented finding that asbestosis did increase the risk of lung cancer, the Q.A.M.A. conspirators affirmatively misrepresented to the public and concealed from the public the extent of risks associated with inhalation of asbestos fibers.

    q. In approximately 1958, the Q.A.M.A. conspirators publicized the edited works of Drs. Braun and Truan at a symposium in an effort to fraudulently misrepresent to the public and persons exposed to asbestos that the inhalation of asbestos dust would not cause cancer.

    r. The fraudulent misrepresentations beginning 1946, as elaborated above and continuing with the publication of the 1958 Braun/Truan study, influenced the standards set for the TLVs, and inhibited the lowering of the threshold limit value due to the cancer risk associated with asbestos inhalation.

    s. In 1967, Q.A.M.A. conspirators determined at their trade association meeting that they would intentionally mislead consumers about the extent of risks involved in inhalation of asbestos products.

    t. In 1952, a symposium regarding the health effects of asbestos was held at the Saranac Laboratories. The following conspirators were in attendance: Johns-Manville, Turner & Newall, Raybestos and Q.A.M.A. members by way of their agents, Cartier, Sabourin and LeChance.

    u. At this meeting, the occurrence of lung cancer and asbestosis in product users was discussed and the carcinogenic properties of all fiber types of asbestos were also discussed. In an affirmative attempt to mislead the public about the extent of health risks associated with asbestos, and in an effort to fraudulently conceal those risks from the public, these conspirators conspired to prevent publication of the record of this 1952 Saranac Symposium and it was not published. In addition, the conspirators induced Dr. Vorwald not to announce the results of his and Dr. Gardner's animal studies showing excess cancers in animals that thereby fraudulently misrepresenting existing data, albeit secret, that could not be publicized because of the secrecy provisions contained in the 1936 Saranac Agreement required by the asbestos industry members.

    v. The following conspirators were members of the Magnesia Insulation Manufacturers Association (MIMA): Philip Carey Corporation (predecessors to Celotex), Johns-Manville, and others.

    w. In 1955, these conspirators caused to be published the MIMA 85% Magnesia Insulation Manual. This manual falsely and fraudulently misrepresented that asbestos-containing products offered no hazard to workers who used these products.

    x. The following conspirators were members of the trade organization known as the Asbestos Textile Institute (ATI): Raybestos, Johns-Manville, H.K. Porter, Keasby & Mattison (individually and through its alter-ego Defendant Turner & Newall), National Gypsum (n/k/a Asbestos Claims Management Corporation), and others.

y. In 1947, the members of the ATI, received a report from W.C.L. Hemeon regarding asbestosis that suggested re-evaluation of the then-existing TLVs for asbestos exposure. The conspirators caused this report not to be published and thereby fraudulently concealed material facts about asbestos exposure from the public and affirmatively misrepresented to the public and class of persons exposed to asbestos that the then-existing TLV was acceptable. Thereafter, these conspirators withheld additional material information on the dust standards from The American Conference of Governmental Industrial Hygienists (ACGIH), thereby further influencing evaluations of TLVs for asbestos exposure.

z. In 1953, conspirator National Gypsum (n/k/a Asbestos Claims Management Corporation) through its agents, in response to an inquiry from the Indiana Division of Industrial Hygiene regarding health hazards of asbestos spray products, refused to mail a proposed response to that division indicting that respirators should be worn by applicators of the products. National Gypsum's response distorted and fraudulently misrepresented the need for applicators of asbestos spray products to wear respirators and fraudulently concealed from such applicators the need for respirators.

aa. In 1955, conspirator Johns-Manville, through its agent Kenneth W. Smith, M.D. caused to be published in the AMA Archives of Industrial Health, an article entitled "Pulmonary Disability in Asbestos Workers". This published study materially altered Dr. Smith's study constituted a fraudulent and material misrepresentation about the extent of the risk associated with asbestos inhalation.

bb. In 1955, the National Cancer Institute held a meeting at which conspirators Johns-Manville (Individually and as an agent for other alleged co-conspirators) and Dr. Vorwald (as agent of co-conspirators) affirmatively misrepresented that there were no existing animal studies concerning the relationship between asbestos exposure and cancer, when, in fact, the conspirators were in secret possession of several studies that demonstrated that positive evidence did exist.

cc. In 1957, the members of the ATI, jointly rejected a proposed research on cancer and asbestos and this resulted in fraudulent concealment from the public of material facts regarding asbestos exposure and also constituted an affirmative misrepresentation of then-existing knowledge about asbestos exposure and lung cancer.

dd. In 1964, the members of the ATI met to formulate a plan for rebutting the association between lung cancer and asbestos exposure that had been recently discussed by Dr. Irving J. Selikoff. Thereafter, these members of the ATI embarked upon a campaign to further misrepresent the association between asbestos exposure and lung cancer.

ee. In 1970, through their agents, co-conspirators, the Celotex Corporation and Carey-Canada, affirmatively misrepresented that they had been in the asbestos business since 1918 and found no reported conditions of asbestosis or lung disease. This constituted a fraudulent misrepresentation about the material facts known to these conspirators.

ff. All conspirators approved and ratified and furthered the previous conspiratorial facts of conspirators Johns-Manville, Raybestos, and Anthony J. Lanza, M.D., acting on behalf of conspirator Met Life, and all alleged co-conspirators during the relevant time period and circumstances alleged above, acted as agents and co-conspirators for the other conspirators.

19. The aforementioned Defendant:

    a. did a tortious act in concert with the other or pursuant to a common design with them; and/or

    b. knew that each other's conduct constituted a breach of duty and they each gave substantial assistance or encouragement to the other so to conduct himself; and/or

    c. gave substantial assistance to the other in accomplishing a tortious result and its own conduct, separately considered, constitutes a breach of duty to the Decedent.

20. The acts of the Defendant as described above, constitute a fraudulent concealment and/or a fraudulent misrepresentation that proximately caused injury to the Decedent in the following manner:

    a. The material published or caused to be published by the Defendant(s) was false and incomplete in that the Defendant(s) knowingly and deliberately deleted references to the known health hazards of asbestos and asbestos-containing products.

    b. Defendant(s) individually, as members of a conspiracy, as agents of other co-conspirators, and as aiders and abettors of each other intended that the publication of false and misleading reports and/or the nondisclosure of documented reports of the health hazards of asbestos would:

        (1.) maintain a favorable atmosphere for the continued sale and distribution of asbestos and asbestos-related products;

        (2.) assist in the continued pecuniary gain of the Defendant(s) through the sale of their products;

        (3.) influence proposed legislation to regulate asbestos exposure to the Defendant(s) benefit;

        (4.) provide a defense in lawsuits brought for injury resulting from asbestos disease.

    c. Decedent(s) continued to be exposed to asbestos because of a belief that it was safe due to Decedent(s) reasonable reliance upon the published medical and scientific data documenting the purported safety of asbestos and asbestos-containing products and the absence of published medical and scientific reports on the extent, nature, and existence of hazards of asbestos and asbestos-containing products.

    d. Defendant(s) individually, as members of a conspiracy, and as agents of each other intended that Decedent(s) rely upon the published report regarding the safety of asbestos and asbestos-containing products and upon the absence of published medical and scientific data regarding the hazards of asbestos and asbestos-related products, to continue Decedent's exposure to these products.

    e. Defendant(s), individually as members of a conspiracy, as agents of each other, as aiders and abettors of each other are and were in a position of superior knowledge regarding the health hazards of asbestos and therefore Decedent had a right to rely on the

16

published reports commissioned by the Defendant(s) regarding the health hazards of asbestos and the absence of published medical and scientific data regarding the hazards of asbestos and asbestos-containing products.

38.   As a result of the acts of the Defendant as aforesaid and the decedent's exposure to asbestos, the decedent was diagnosed as suffering from lung cancer, asbestosis, pleural effusions, pleural plaques, asbestos-related lung disease, lung disease and / or loss of lung function. He endured significant pain and mental anguish.  His earning capacity was impaired and he was severely restricted in his usual activities. He was required to spend large sums of money for medical care and treatment. He suffered grief, fear and anguish over the effect of his illness; the pain caused by his symptoms; the worsening of his symptoms, condition, and disease; his premature death; and the effect his illness had, and his premature death would have, on his family.  As a consequence of his asbestos-related injuries, Harold Snipe died on or about March 19, 2014, and he and his estate were denied life's enjoyment, earnings, and incurred expenses for medical care and treatment and funeral bills, for which just compensation is sought.

## REQUEST FOR RELIEF

WHEREFORE, the Plaintiff, Synovia Daniels as Personal Representative for the Estate of Harold Snipe, claims against the Defendants jointly and severally:

39. Money damages;

40. Punitive and exemplary damages; and

41. Such other relief as the Court may deem proper.

## **DEMAND FOR JURY TRIAL**

42. Plaintiff hereby requests a jury trial on all issues raised in this complaint.

Dated: February 5, 2016

                                SYNOVIA DANIELS, PERSONAL
                                REPRESENTATIVE OF THE ESTATE OF
                                HAROLD SNIPE

                                By__S/ Amity L. Arscott_____
                                Amity L. Arscott, Esq. (ct27021)
                                Embry & Neusner
                                P.O. Box 1409
                                Groton, CT  06340
                                (860) 449-0341
                                alarscott@embryneusner.com